

FILED

Jun 08 2023, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Victoria Bailey Casanova
Casanova Legal Services
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Bradley Vernon, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

June 8, 2023

Court of Appeals Case No.
22A-CR-2534

Appeal from the Marion Superior
Court

The Honorable Mark Stoner,
Judge

Trial Court Cause No.
49D32-2004-F5-013546

**Opinion by Judge May**
Judge Bradford concurs.
Judge Mathias concurs in result with a separate opinion.

**May, Judge.**

[1] Bradley Vernon, Jr., appeals his conviction, after a bench trial, of Level 5 felony battery resulting in bodily injury to a person less than 14 years of age.[1] He argues the State did not rebut his affirmative defense of parental privilege. We affirm.

## Facts and Procedural History

[2] Vernon and E.P. ("Mother") have two children: D.V. ("Son"), born October 6, 2010, and his older sister S.V. ("Daughter"). Both Son and Daughter are diagnosed with autism, but Son is severely autistic and non-verbal. Son is able to say a few words but is unable to communicate complex ideas. Son sometimes throws tantrums "because he wants something that he can't have at the moment." (Tr. Vol. 2 at 53.) His tantrums involve vocalizing or screaming and hitting himself with his hands on his forehead, or he "will take his forehead and tap it against an object. Sometimes, not hard. Sometimes, a little harder." (*Id.* at 51.) After his tantrums, Son often has had small, light-colored bruises or a swollen bump on the center of his forehead. Mother and staff members at his Applied Behavior Analysis (ABA) therapy program[2] ("School") would restrain him during serious tantrums by bear hugging him and pinning his arms down at his side while supporting his head. If Son continued to try to bang his head

---

[1] Ind. Code § 35-42-2-1(c)(1) & (g)(5)(B).

[2] Son received ABA therapy in a clinic instead of attending traditional school. Mom and Vernon refer to this programing as "school."

against things, they "would move him away from any hard objects if he was really escalated so that he couldn't bang his head against things, and provid[e] a pillow, if necessary." (*Id.* at 116.) Staff would position a pillow between themselves and Son "so that he couldn't bang against us." (*Id.* at 116.) Son had not experienced bruising from being restrained by staff or Mother.

On January 29, 2020, Vernon picked up Son from Mother's house for an overnight visit.[3] When Son left Mother's house, he had no bruises. Vernon put Son to bed between 11 p.m. and midnight. At 11:58 p.m., Mother and Vernon exchanged the following text messages:

Mother: He doin okay?

Vernon: He having a melt down

Mother: Oh no [crying emoji]

Probably over tired

Please let me know if he calms down.

Vernon: He asleep

Mother: Thanks

Vernon: He didn't do any self harm

(Ex. Vol. 1 at 4) (errors in original).

---

[3] Vernon and Mother no longer have a romantic relationship. Mother has primary custody and Vernon has one overnight visit per month with Son.

[4]     Son woke around 2:30 or 3:00 a.m. and at 3:26 a.m., Vernon texted Mother again:

> Vernon:     Grrr he pissing me off
>
> He got gum stuck in his hair. And been going through a melt down the past hr
>
> [picture of Son's right cheek]
>
> He finally falling back to sleep. He got a bad bruise on his cheek from his melt down, I don't know about other side.

(*Id.* at 5-6) (errors in original). Father was "angry that night" and "very irritated." (Tr. Vol. 2 at 151, 158.) Mother responded at 7 a.m.:

> Mother:     Everything okay?
>
> Vernon:     Eh. We just woke up again
>
> Mother:     Maybe cuz he hasn't slept there in awhile
>
> Vernon:     He still my buddy
>
> Mother:     What did he hit his cheek on?
>
> Vernon:     With his hands
>
> Mother:     I've only ever seen him bruise his forehead.
>
> Vernon:     Unless he used something when I wasn't looking.
>
> [picture of Son's right cheek]
>
> Vernon:     I feel like shit he got a bruise on his cheek.
>
> Mother:     You have no idea what he could have hit it on?

| Vernon: | I wish I knew. It reaches from his chin to an inch from his ear. From jaw line to just level to his upper lip. |
|---|---|
| | Its literal purple |
| | I had to pin him down acouple times because he was smacking himself |
| Vernon: | [picture of Son's right cheek] |
| | Oh bubby. |
| | That makes me feel horrible |
| | I have failed our son. |

(Ex. Vol. 1 at 6-9) (errors in original).

[5] Vernon dropped Son off at School, where a staff member noticed severe bruising and observed that Vernon seemed "nervous." (Tr. Vol. 2 at 118.) Vernon told the staff that Son woke up during the night, wanted a toy he could not have, and then hit himself with that toy. The bruising on Son's face was deep purple and black and covered his entire left cheek and a portion of his right cheek. School staff took pictures of the bruising and contacted Mother and the Department of Child Services ("DCS"). The next day, January 31, 2020, Mother took Son to his regular pediatrician, who also observed bruising and abrasions on the right side of Son's neck and bruising on his right buttock and posterior right thigh. His pediatrician had never seen self-harm injuries on Son except on his forehead and had never before seen injuries like this on Son.

[6]     DCS referred Son to Dr. Ralph Hicks, a pediatrician with Indiana University Health. Dr. Hicks opined Son's injuries were most consistent with an "inflicted injury." (*Id.* at 94.) Given the pattern, nature, and extent of the bruising, the injury was not consistent with Son hitting himself. Dr. Hicks further indicted that "given the extent of the bruising, the pattern on one side, the fact that it – that the bruising extended below the jawline, and it was involving . . . different planes of the body, I did not feel like [the dresser][4] was consistent with the . . . injuries that the child had." (*Id.* at 95.)

[7]     During opening statements, Vernon asserted the affirmative defense of parental privilege and argued while he caused Son's bruising, his intention was to parent, not to abuse or batter. After hearing the evidence, the trial court found, based on the "overwhelming evidence of the injuries themselves," that the State disproved Vernon's claim of parental privilege. (*Id.* at 171.) It further found Vernon's actions were unreasonable and disproportionate, especially in light of his evolving explanation[5] and Son's substantial injuries.

# Discussion and Decision

[8]     To convict Vernon of battery resulting in bodily injury to a person less than fourteen years of age, the State was required to prove beyond a reasonable

---

[4] On February 5, 2020, Vernon told DCS that Son's injuries were due to Son falling into Vernon's dresser.

[5] Vernon first told Mother that Son caused the bruising with his hand, but then indicated Son must have hit his face with a toy. Vernon told police that Son pounded his head into the corner of Vernon's dresser two to three times. At trial, Vernon testified Son either tripped or purposefully hit his head on Vernon's dresser.

doubt that Vernon knowingly or intentionally touched Son in a rude, insolent, or angry manner and that touching resulted in bodily injury. *See* Ind. Code § 35-42-2-1. Vernon does not contest the finding that he battered Son causing bodily injury; however, Vernon asserts the State did not present sufficient evidence to disprove his parental privilege defense.

[9] Our Supreme Court has recognized that "[a] parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his [or her] child as he [or she] reasonably believes to be necessary for its proper control, training, or education." *Willis v. State*, 888 N.E.2d 117, 182 (Ind. 2008) (quoting Restatement of the Law (Second) Torts, § 147(1) (1965)). "[T]o sustain a conviction for battery where a claim of parental privilege has been asserted, the State must prove that either: (1) the force the parent used was unreasonable or (2) the parent's belief that such force was necessary to control [their] child and prevent misconduct was unreasonable." *Willis*, 888 N.E.2d at 182. "[T]o negate a claim of parental privilege, the State must disprove at least one element of the defense beyond a reasonable doubt." *Id*. We neither reweigh the evidence nor judge the credibility of the witnesses. *Perrey v. State*, 824 N.E.2d 372, 373 (Ind. Ct. App. 2005), *trans. denied*. We consider conflicting evidence "most favorably to the trial court's ruling." *Wright v. State*, 828 N.E.2d 904 (Ind. 2005).

[10] Here, Vernon claims the State's evidence was insufficient to disprove his claim of parental privilege. Vernon argues his force was reasonable and necessary to prevent Son from harming himself or Vernon. Vernon further argues "the fact a

parent causes bruising when physically discipling a child does not necessarily mean that discipline was unreasonable." (Appellant's Br. at 13.) To assess the reasonableness of Vernon's actions, the trial court considers:

> (a) whether the actor is a parent;
>
> (b) the age, sex, and physical and mental condition of the child;
>
> (c) the nature of his offense and his apparent motive;
>
> (d) the influence of his example upon other children of the same family or group;
>
> (e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;
>
> (f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause serious or permanent harm.

*Willis*, 888 N.E.2d at 182 (quoting Restatement of the Law (Second) Torts, § 150 (1965)).

In Vernon's case, he is Son's father, Son was ten years old at the time of the incident, and Son is nonverbal and diagnosed with a severe form of autism. Vernon used a level of force that caused an entire side of Son's face to be bruised purple. Moreover, Son's injuries included bruising and abrasions on the right side of his neck and bruising on his right buttock and posterior right thigh.

[12] "As in all cases in which the question arises as to whether there has been excessive means of carrying out the privilege [to use force], the actor is not privileged to use a means to compel obedience if a less severe method appears to be likely to be equally effective." *Willis*, 888 N.E.2d at 183. The State presented evidence that Mother and School staff restrained Son in the past without causing injury or bruising by embracing him and pinning his arms down at his side while supporting his head. If necessary, pillows were added to protect themselves and Son from injury during the tantrum.

[13] Vernon testified that when Son would not go back to bed, Vernon picked Son up, tossed him onto the bed, and it turned into a "wrestling match." (Tr. Vol. 2 at 151.) While on the bed, Vernon laid on top of Son, putting his full 265 pounds on Son's 100-pound frame. Vernon told Detective Vinson Boyce during an interview that he laid on Son for about thirty minutes before attempting to get up, but Son was still agitated, so Vernon continued applying his weight until Son fell asleep – "from beginning to end, it lasts about an hour." (Ex. 14 at 12:30-12:50.)

[14] Vernon asserts that he acted reasonably, but his credibility is undermined by his repeatedly changing explanation. *See supra* n.4. Dr. Hicks opined that:

> [W]hat we know about well-documented significant accidental injuries in children is that, . . . once the event occurs, the caregiver or parent typically will seek medical care fairly promptly for a significant injury, and, . . . provide an explanation or history that -- that makes sense and also is consistent over

time. So, a changing history is something that heightens our concerns for inflicted injury.

(Tr. Vol. 2 at 94.)

[15] In light of all facts in this case, we conclude the State submitted ample evidence to demonstrate beyond a reasonable doubt that the force Vernon used against Son was unreasonable. *See*, *e.g.*, *Hart v. State*, 93 N.E.3d 803, 808 (Ind. Ct. App. 2018) (holding Father used unreasonable force by slapping and kicking Child, which was not for discipline but was an angry reaction to Child's behavior). Accordingly, we cannot overturn his conviction based on his asserted defense of parental privilege.

# Conclusion

[16] We affirm Vernon's conviction of Level 5 felony battery resulting in bodily injury to a person less than fourteen years of age.

[17] Affirmed.

Bradford, J., concurs.

Mathias, J., concurs in result with a separate opinion.

**Mathias, Judge, concurring in result.**

[18] I fully concur in the majority's opinion. The trial court's judgment is supported by the record, and Vernon's arguments on appeal ultimately seek to have this Court reweigh the evidence, which we will not do.

[19] I write separately only to recognize the difficulty of parenting a child with severe autism. This is especially true where, as here, the child is of an age or at a stage of growth where the child has significant physical strength, and the child's placement on the spectrum involves outbursts that require physical restraint. In the language of the factors of the Restatement of Law (Second) Torts, § 150 (1965), which our Supreme Court adopted in *Willis*, the fact-finder's consideration of the child's "age," "physical and mental condition," and the parent's use of force or confinement in a manner "reasonably necessary and appropriate to compel obedience" may all be influenced by a child's severe autism. *See Willis v. State, 888 N.E.2d 177, 182 (Ind. 2008)*.

[20] That said, for all the reasons explained by the majority on this record, Vernon's response to Son's outburst went well beyond the "reasonable force" or "reasonable confinement" "necessary for [the child's] proper control." *See id.* Accordingly, I concur in the majority's decision to affirm the trial court's judgement.